The STATE of Ohio, Appellant,

v.

ZIMBECK, Appellee.

[Cite as *State v. Zimbeck*, 195 Ohio App.3d 729, 2011-Ohio-2171.]

Court of Appeals of Ohio,
Sixth District, Fulton County.

No. F–10–001.

Decided May 6, 2011.

Scott A. Haselman, Fulton County Prosecuting Attorney, for appellant.

Gregory L. VanGunten and Amber L. VanGunten, for appellee.

PIETRYKOWSKI, Judge.

{¶ 1} This is an appeal from a judgment of the Fulton County Court of Common Pleas, which granted the motion of defendant-appellee, Walter Zimbeck, to dismiss the aggravated-murder and murder charges against him on the ground of preindictment delay. The state now challenges that judgment, as well as the

court's denial of the state's motion to reopen the hearing, through the following assignments of error:

{¶ 2} "I. The trial court committed reversible error when it overruled the state's motion to reopen the hearing related to appellee's first motion to dismiss: pre-indictment delay.

{¶ 3} "II. The trial court committed reversible error when it granted appellee's first motion to dismiss: pre-indictment delay and dismissed the indictment."

{¶ 4} On July 20, 2009, appellee, Walter Zimbeck, was indicted for the aggravated murder of Lori Ann Hill, which occurred more than 23 years before. Hill was last seen alive on the evening of October 25, 1985, walking toward her home in Lucas County. She was 14 years old. Four days later, her naked body was discovered in a field near Wauseon, Fulton County, Ohio. She was wearing only one sock. The other sock and her jean jacket were found nearby. None of her other clothing has ever been recovered. Blue paint chips, however, were discovered on the jean jacket. The cause of death was multiple blunt force and sharp injuries. In particular, her skull was fractured, and she had numerous bruises, abrasions, and lacerations over her body. The coroner opined that the skull fractures were likely caused by an iron instrument such as a pry bar, crow bar, or pipe, but that information was not made public. In addition, although semen was identified on a vaginal swab taken from Hill, there was no evidence of trauma, and the coroner did not determine that she had been raped. Because it was not clear whether she had been killed in Fulton County or Lucas County, the sheriffs of both of those counties initiated investigations. Those investigations, however, were not well coordinated, and the lack of adequate communication between the jurisdictions hampered both investigations.

{¶ 5} At the time of her death, Hill was dating an 18–year–old boy named Craig Rupp. They had been dating for only about one month. Previously, Hill had dated Zimbeck for nearly 18 months. Zimbeck was also 18 years old at the time of Hill's death. On the evening of October 25, 1985, Rupp picked Hill up at her home at approximately 6:30. They ate dinner at a McDonald's and later, at around 9:00 p.m., arrived at a party in Swanton. Hill and Rupp got into an argument at the party, and Hill left at around 9:30. She was then given a ride into downtown Swanton by a friend, Steve Nowakowski. Hill was next seen outside Mr. G's Pizza in downtown Swanton by another friend, Rhonda Whitman. The two girls spoke briefly, and Hill told Rhonda that she was waiting for a friend. Rhonda told officers investigating the murder that Lori did not seem upset. This was shortly before 10:00 p.m. Hill was subsequently seen walking northbound on Hallett Avenue toward her home. Deborah Ronau, a neighbor, stopped and asked Hill if she wanted a ride, but she refused.

{¶ 6} Finally, Ron and Joan Bettinger, neighbors of the Hill family, were driving home from a football game at around 10:30 p.m. when they came across three teenagers walking northbound on State Route 295, approximately 100 yards from Hill's home. The teens were walking in the middle of the road, so the Bettingers had to slow down as they approached them. Shortly after Hill's disappearance, Ron Bettinger called the Swanton police and reported what he had seen. He stated that the individual in the center was a tall girl with blond hair. To her right was a boy who was taller than the girl and who had dark shoulder-length hair. To the left of the girl was a shorter, heavy-set person who Bettinger said could have been either a boy or a girl. As the Bettingers came upon the teens, the boy to the right of the girl stepped further into the road and turned around to face their car. The girl in the middle turned partially around. The teens then stepped aside, and the Bettingers passed them. Ron Bettinger told Police Chief Tom Bates that when the report came over the evening news that Hill was missing, he and his wife realized that the girl they had seen walking in the road was Hill. Hill had been to their house a few times and knew their son. Bettinger also stated that the girl he saw was wearing a blue jeans jacket, blue jeans, and a white shirt.

{¶ 7} In addition, there were other possible sightings of Hill throughout the night.

{¶ 8} At approximately 2:00 a.m. on October 26, 1985, Lori's parents reported her missing. A search ensued, and on October 29, 1985, Lori's body was found in a field along Road M between S.R. 12 and S.R. 13 in Fulton County. As noted above, both the Fulton County and Lucas County sheriff's departments began investigating Lori's death. Because of his relationship with Lori, Zimbeck was identified early on as a possible suspect. On November 1, 1985, he was interviewed by Detective Lacourse and Sergeant Damasco as part of the Lucas County investigation. In that interview, Zimbeck stated he had dated Hill since she was in the eighth grade, but that recently she had wanted to date Craig Rupp. Although Zimbeck had not seen her for approximately two weeks, he stated that he and Hill talked on the phone almost daily. On October 25, Zimbeck was supposed to work at his regular job as a busser at the El Matador restaurant on Airport Highway. However, because his friend Denny Miller had just returned from Texas, he took the night off from work to spend time with some friends. Zimbeck then stated that he, Ken Marrow, Mark Sonley, and Denny Miller's younger brother went to Denny Miller's apartment behind Southwyck Mall. He stayed there until about 7:00 p.m., at which time he went to his home at the Garden Road apartments in Maumee, where he stayed for the rest of the night. At that time, Zimbeck lived with his mother and stepfather.

{¶ 9} Subsequently, on November 5, 1985, Zimbeck was interviewed by Sergeants Lowell Warncke and Robert Albright of the Fulton County Sheriff's Department. In that interview, Zimbeck gave a different story regarding his whereabouts on the evening of October 25. He also went into greater detail regarding his conversations with Hill in the days leading up to her disappearance. Zimbeck stated that although Hill had started dating Craig Rupp, she and Zimbeck discussed getting back together, and on October 25, Hill had intended to break up with Rupp. Regarding his whereabouts on the evening of October 25, Zimbeck again discussed meeting up with his friends at around 4:00 p.m. Then, however, he stated that the group went to Southwyck Mall, where he ran into Bob, who was also a busser at El Matador restaurant. Zimbeck also told the Lucas County officers that while he was at the mall, he had met a girl named Sandy. After spending time with Sandy, Zimbeck had suggested that the two go back to his apartment. They returned to Zimbeck's apartment, where Sandy stayed until about 2:00 a.m. the next day. Shortly after Sandy left, the phone rang. It was his neighbor Rob, a Lucas County Deputy Sheriff, telling him that Hill was missing. During his November 5, 1985 interview with the Fulton County officers, Zimbeck denied ever receiving a telephone call from Hill that evening and denied that she had called him looking for a ride.

{¶ 10} Thereafter, Zimbeck agreed to submit to a polygraph examination in the Fulton County investigation. Because the exam did not reveal any deception when he denied involvement in Hill's death, the Fulton County investigators directed their attention toward other suspects. In particular, they focused their attention on James and William Little and Richard Nijakowski. In November 1986, a case was presented to the Fulton County Grand Jury, but the grand jury did not return any indictment. The case lingered for years, with various witnesses coming forward with stories of situations and sightings of Hill that they believed they had witnessed on October 25, 1985, but the investigation stagnated.

{¶ 11} In 2008, Hill's sister, Rachel, contacted the cold-case unit of the Toledo Police Department. The cold-case unit is a task force of detectives who attempt to solve unsolved crimes. After the Fulton County Sheriff agreed to have the cold-case unit examine the case, Detective Steve Forrester began to assemble the evidence gathered through both the Fulton County and Lucas County investigations. During his review of the evidence, he realized that in 1985, Zimbeck had given conflicting statements to the Fulton County and Lucas County investigators regarding his whereabouts on the evening of October 25, 1985. Investigators then talked to Zimbeck's mother, Carol Behrens. Behrens told investigators that on the evening that Hill disappeared, Zimbeck had left their home to go find her. Later that evening, Hill called the house three times looking for Zimbeck. Carol told her that she thought he was with Hill. Carol remembered that the

second call was from somewhere very noisy and that Hill was very angry when Carol said that Zimbeck was not home. She also remembered that Hill was again very angry during the third call, swore at her, and hung up on her. During the third call, there was no noise in the background. Carol further remembered that the phone rang two more times that night. The first call was very late. It was Hill's sister looking for her. Carol remembered that after that phone call, Zimbeck came home with his friend, whose last name Carol remembered as Lonsway. Carol stated that Lonsway was a good friend of Zimbeck's and that he was around Zimbeck's age. Carol noted that Zimbeck was drunk. Later, the phone rang again. Again it was Hill's sister, this time reporting that Hill was missing. Zimbeck then said he was leaving to go to Hill's parents' home, and he and Lonsway left. Upon questioning by the investigators during this interview, Carol was consistent in her memory of the events of October 25, 1985.

{¶ 12} After interviewing Carol Behrens, the cold-case investigators determined that they needed to talk to Zimbeck. They traveled to his home in Tennessee, where they questioned him about his relationship with Hill and the night she disappeared. During this conversation, Zimbeck admitted that he had lied to both the Lucas County and Fulton County authorities in 1985 but he could not explain why he lied. Further, when confronted with his mother's memory of that night, he denied being with Willie Lonsway.

{¶ 13} Several days later, Detective Forrester again spoke to Carol Behrens. This time, however, she was less certain of her story. Subsequently, Forrester located Sandy Keller, the "Sandy" whom Zimbeck claimed to have spent the evening with on the night Hill disappeared. Keller told Forrester that she recalled meeting Zimbeck at the Southwyck Mall in the fall of 1985. She dated him for only about one month, but she recalled that shortly after meeting him, she spoke to him on the telephone. She was also clear that this was the first time she had spoken to him by telephone. Keller stated that Zimbeck was very upset, told her that his ex-girlfriend had been killed or murdered, that it had happened the night he met Keller, that the police had spoken to him, and that she, Keller, was his alibi. Although Keller remembered having gone to Zimbeck's apartment several times, she did not believe she went there the first night that she met him, and she was clear that Zimbeck never sneaked her into the apartment and that she never sneaked out through his bedroom window.

{¶ 14} After Keller spoke with Forrester, she had a telephone conversation with Zimbeck that was tape recorded. That recording was admitted into evidence at the hearing below. During that conversation, Zimbeck attempted to convince Keller that on the night they met, she came back to his apartment and spent the night, and then the two were awakened by his mother, who told him he

had a phone call about a missing girl. However, Keller denied ever spending the night at Zimbeck's apartment and did not recall his version of events.

{¶ 15} In addition, the cold-case unit interviewed other witnesses who knew Zimbeck and Hill during the time they dated and thereafter. In particular, Linda Fusaro, a family friend of the Hills', stated that on October 26, 1985, when the search for Hill had started up, she posted fliers with Zimbeck and spent time with him looking for Hill. She had not previously been interviewed by investigators. She stated that on that day, Zimbeck had a number of scratches on his arm and looked as if he had run through a rose garden. Although she did not personally ask Zimbeck about the scratches, she heard him explain that he had been in a bar fight the night before.

{¶ 16} On July 20, 2009, the Fulton County Grand Jury returned a two-count indictment, charging Zimbeck with the aggravated murder and murder of Hill. On October 29, 2009, Zimbeck filed a motion to dismiss the indictment. As grounds for the motion, he cited the nearly 24–year delay between the time of Hill's death and the return of the indictment. This delay, Zimbeck asserted, violated his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution. In support of his claim, Zimbeck asserted that lost alibi witnesses and lost physical evidence substantially prejudiced his ability to defend himself. Following briefing of the issues, the court held a hearing at which numerous witnesses testified. Subsequently, the state filed a motion to reopen the hearing so that it could call two new witnesses, Christine Tolford and Michael Bunting, to testify regarding alleged actions of Zimbeck around the time of Hill's death.

{¶ 17} On January 11, 2010, the court issued a judgment entry granting Zimbeck's motion to dismiss and denying the state's motion to reopen the hearing. In a detailed decision, the court concluded that the 23–year delay in this case caused Zimbeck actual and substantial prejudice. The court then determined that because the "new" evidence was merely testimonial, comprised of contradictory statements, the prosecution of Zimbeck was not justified, and the case must be dismissed. It is from that judgment that the state appeals.

{¶ 18} We will first address the second assignment of error, in which the state asserts that the lower court erred in granting Zimbeck's motion to dismiss. Specifically, the state contends that Zimbeck did not suffer any actual or substantial prejudice in the delay of his prosecution and that even if he did suffer prejudice, the state had a justifiable reason for the delay in the form of newly discovered evidence.

{¶ 19} "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution." *State v. Luck* (1984), 15 Ohio St.3d 150, 15 OBR 296, 472 N.E.2d 1097, paragraph two of the syllabus (following *United States v. Lovasco* (1977), 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 and *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468). In order to succeed on a claim of a due-process violation, the defendant must first show that he suffered actual, substantial prejudice because of the delay. *Lovasco* at 790. See also *State v. Whiting* (1998), 84 Ohio St.3d 215, 702 N.E.2d 1199. Upon such a showing, the burden then shifts to the state to prove that the reasons for the delay were justifiable and outweigh the prejudice suffered by the defendant. *Whiting* at 217. The Supreme Court of Ohio has found actual prejudice to a defendant where key witnesses have died, memories have faded, and evidence has been lost. *Luck* at 157. Regarding the issue of unjustifiable delay, the court in *Luck* further determined that "a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased. The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable." Id. at 158.

{¶ 20} When reviewing a trial court's decision dismissing an indictment on the ground of preindictment delay, this "court must accord due deference to the trial court's findings of fact, but may freely review the trial court's application of the law to the facts." *State v. Ricosky*, 5th Dist. No. 2003CA00174, 2004-Ohio-2091, 2004 WL 882477, ¶ 13.

{¶ 21} The state first asserts that the lower court erred in finding that Zimbeck was prejudiced by the delay because of lost alibi witnesses, diminished memories, and missing evidence. To prove actual prejudice, a defendant must show, by concrete proof, the exculpatory value of any alleged missing evidence. See *State v. Gulley* (Dec. 20, 1999), 12th Dist. No. CA99–02–004, 1999 WL 1238427, citing *United States v. Doerr* (C.A.7, 1989), 886 F.2d 944, 964; see also *State v. Brown* (Mar. 17, 2000), 4th Dist. No. 98CA25, 2000 WL 303142, citing *Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. In other words, a defendant must show how lost witnesses, memories, and physical evidence would have

proven the defendant's asserted defense. *Gulley State v. Davis*, 7th Dist. No. 05 MA 235, 2007-Ohio-7216, 2007 WL 4696960, ¶ 17 ("without proof of prejudice, meaning something which adversely affects [a defendant's] ability to defend himself at trial, there is no due process violation for preindictment delay in prosecution"). A showing based on mere speculation will not be found sufficient, see *Gulley* and *Brown*, and a court may not presume prejudice where a delay has been lengthy, *Gulley*, citing *United States v. Crouch* (C.A.5, 1996), 84 F.3d 1497, 1515.

{¶ 22} Zimbeck's defense is that he had an alibi for the time during which Hill was likely killed. Zimbeck claims that on the night Hill disappeared, he had met a girl named Sandy, now known as Sandy Keller, at the mall and that eventually the two came back to his apartment. The diminished memories of individuals who could have established Zimbeck's alibi, however, adversely affect his ability to defend himself at trial. Nevertheless, given that Zimbeck himself has been, at the least, inconsistent in his alibi, the exculpatory value of this evidence is questionable.

{¶ 23} In 1985, Zimbeck told officers of the Fulton County Sheriff's Department that on the night of October 25, he had met a girl named Sandy at the mall, that eventually the two came back to Zimbeck's apartment, which he shared with his mother and stepfather, and that Sandy had stayed until approximately 2:00 in the morning. Zimbeck claims that interviews with Sandy and Zimbeck's mother and stepfather in 1985 could have confirmed this story. In 1985, however, because Zimbeck had passed a lie-detector test, he was no longer considered a suspect. Sandy was never interviewed, and although Zimbeck's mother, Carol Behrens, was interviewed, she was questioned only about Hill's character and was not asked about Zimbeck's whereabouts on the evening of October 25. Nevertheless, when Behrens was questioned by officers in 2008, she had a clear memory of the events of October 25, 1985. She was clear that Zimbeck had returned home late at night with the "Lonsway boy," that he had been drinking, and that he was sitting on the couch when she expressed her anger at him for not contacting Hill earlier. She was also clear about the timeline of the telephone calls that she had received that evening. The first call from Hill came in the early evening. The second call from Hill came several hours later, and there was noise in the background. The investigation revealed that this call most likely came from Mr. G's Pizza in Swanton. Approximately one hour later, Hill called again. Behrens's statements were recorded and transcribed, with both the recordings and transcriptions admitted into evidence at the hearing below on the motion to dismiss.

{¶ 24} After speaking with Behrens on December 28, 2008, officers from the cold-case unit interviewed Zimbeck. After that interview, officers interviewed

Behrens a second time, on January 2, 2009. During this interview, Behrens was less certain of her memory. It was also clear that she had spoken with Zimbeck since she had been interviewed by officers several days before and that Zimbeck had told her that Sandy was in his bedroom on the night that Hill had been killed. She also affirmed that Willie Lonsway was the boy who was with Zimbeck that night.

{¶ 25} When Behrens testified at the hearing on the motion to dismiss, she completely changed her story. She testified that although she had received several phone calls on the night of October 25, only one of them was from Hill. She also would not confirm that Willie Lonsway was with Zimbeck when he returned home.

{¶ 26} Zimbeck also claims that other witnesses who could have confirmed that he was at the mall on October 25 are now missing or have died. Because these witnesses could confirm Zimbeck's whereabouts only until about 7:00 p.m., however, Zimbeck has not established the exculpatory value of their testimony.

{¶ 27} Finally, Zimbeck claims that Sandy Keller, the girl he claims was with him on the night of October 25, is key to his alibi.

{¶ 28} The problem with Zimbeck's presentation of his alibi, however, is that it is directly refuted by his own statements to the police in December 2008, in which he admitted that both stories he told to officers in 1985, including the story that a girl named Sandy came back to his apartment that night, were lies. The transcript from the December 30, 2008 recording reveals Zimbeck's statements to officers at that time and responses when confronted with his 1985 statements:

{¶ 29} "Q: Okay. I'm going to ask you this again now, you gave two different statements to two different police officers. And both of them we know were lies; right? Because you weren't home that night. I mean your mom said you weren't home. Lori called your house, and if Lori would have called you would have been home.

{¶ 30} "A: Right.

{¶ 31} " * * *

{¶ 32} "Q: So we are clear. The twenty-ninth, two days later on the first, three days later, whatever, you talked to the police. All this is fresh in your mind. They say, 'What did you do on that night?' And you said, 'Well, I was home at seven o'clock and I went to sleep at eleven.' Which isn't true because your mom said you weren't home.

{¶ 33} "A: Right. I wasn't home.

{¶ 34} "Q: Then four days later you talk to different police, they say, what did you do? I went to Southwyck, hung out with this girl. I can't remember her last

name. She was at my house from ten till two, which wasn't true; right? She wasn't at your house from ten till two?

{¶ 35} "A: No.

{¶ 36} "Q: So that's twice. That's two stories that weren't true that you'd given to the police just after your girlfriend is found murdered.

{¶ 37} "A: Uh-huh [affirmative response].

{¶ 38} "Q. So how can anybody not want an explanation for that? So that's why we came to you, to give you an [sic] chance to explain that to us.

{¶ 39} "A: Look, I don't know what to say to you. I mean, I don't—

{¶ 40} "Q: And then the next morning you told the Hill family that you got in a bar fight that night.

{¶ 41} "A: Uh-huh [affirmative response].

{¶ 42} "Q: And then your mother—

{¶ 43} "A: I don't necessarily remember that either, but I mean.

{¶ 44} "Q: But your mother told—

{¶ 45} "A: This was twenty-some years ago.

{¶ 46} "Q: Your mother was extremely, extremely sure of her facts. I mean, she remembered all the calls that Lori made.

{¶ 47} "A: Uh-huh [affirmative response].

{¶ 48} "Q: You know, she remembers music in the background in one of them. She said Lori called three times, she called the house.

{¶ 49} "A: Uh-huh [affirmative response].

{¶ 50} "Q: She said that you got home between two of the family calls, one family call came about 1:30 another one came an hour or so after that. And during that time frame you came home. You didn't go to bed, you were sitting up. And you were drunk and you were with Willie."

{¶ 51} It was after this interview that Zimbeck spoke to his mother and Sandy. His telephone conversations with Sandy were recorded. During that conversation, Zimbeck attempted to resurrect his alibi that he was with Sandy that night by trying to convince her that the night they met, they came to his apartment very late, and he had sneaked her into his bedroom so his mother would not know she was there. He then tried to convince her that she had stayed the night and had left early the next morning by climbing out the bedroom window. When she was interviewed by police, Sandy stated that although she had been at Zimbeck's apartment several times during the short time that they dated, she never spent

the night, he never sneaked her into the apartment, and she never left out the bedroom window.

{¶ 52} While we agree that Zimbeck was prejudiced by the diminished memories of Behrens and Keller, we must determine whether Zimbeck established "actual prejudice." That is, we must determine whether Zimbeck established the exculpatory value of these witnesses' memories. Given that Zimbeck himself told officers in December 2008 that he did not bring Sandy back to his apartment on the night of October 25, 1985, and that his statement to that effect in 1985 was a lie, we find that Zimbeck failed to show by concrete proof the exculpatory value of these witnesses' memories had they been questioned about Zimbeck's whereabouts in 1985.

{¶ 53} The state also asserts that Zimbeck was not prejudiced by the loss of physical evidence in this case. It is noteworthy that even in 1985, very little physical evidence was collected in this case. Nevertheless, the potential exculpatory nature of samples collected in a rape kit is unquestionable. In 1985, the items of evidence collected from the victim's body included oral, rectal, and vaginal smears that were placed on slides and oral, rectal, and vaginal swabs that were placed in separate vials. On October 31, 1985, the Fulton County Sheriff's Department submitted those items to the FBI laboratory in Washington, D.C. for serology analysis. On February 14, 1986, the FBI laboratory submitted its report to the Fulton County Sheriff on the test results. Of the evidence submitted, blood was found on the oral smear and swab, but no blood or semen was found on the rectal or vaginal smears. Semen was found only on the vaginal swab, but grouping tests conducted on the semen failed to disclose the presence of any blood-group substance. In addition, no spermatozoa cells were found on any of the samples. The testing that was conducted on the vaginal swab, however, required the consumption of the entire sample.

{¶ 54} In 1988, this evidence was submitted to the Ohio Bureau of Criminal Identification and Investigation ("BCI") for potential DNA testing. Upon examination of the samples, forensic scientist James Wurster determined that there was not sufficient quantity or quality of material on the slides and swabs to undergo DNA testing.

{¶ 55} Following 1988 testing, the evidence was returned to the Fulton County Sheriff's Department, where it was apparently misplaced. It was rediscovered in 2009 following Zimbeck's indictment.

{¶ 56} In the proceedings below, much was made of the state's failure to adequately safeguard the condition of the samples taken from the victim, with Zimbeck asserting that DNA testing of this evidence would clearly exonerate him had the samples been properly maintained. Given, however, that the vaginal swab, the only sample upon which semen was found, was consumed by the testing

process in 1986, the fact that the vial was not properly maintained is irrelevant. Zimbeck further asserts that the vaginal smear slide could have yielded DNA, but because it was not refrigerated or properly maintained, it cannot now be tested. When the vaginal smear slide was first examined in 1986, no blood or semen was found on the sample. When it was again examined in 1988 for possible DNA testing, the sample was insufficient, given the DNA testing protocols at that time.

{¶ 57} To establish that he has been actually prejudiced by the inability to now test this evidence, Zimbeck must show by concrete proof the exculpatory value of the missing evidence. Mere speculation will not suffice. *State v. Robinson*, 6th Dist. No. L–06–1182, 2008-Ohio-3498, 2008 WL 2700002, ¶ 156. Moreover, where the alleged missing evidence could be equally inculpatory, the defendant has not met his burden. See *Gulley*, 12th Dist. No. CA99–02–004, 1999 WL 1238427. We find that because no blood, semen, or spermatozoa cells were ever detected on the vaginal smear slide or rectal smear slide through previous testing, the possibility of cellular evidence still remaining on the slides that could be tested using modern techniques is speculative at best. In particular, we note that in the hearing below, Zimbeck did not produce a witness or other evidence to establish that such testing could have been successful had the slides been properly stored. Accordingly, Zimbeck has not established the exculpatory value of the missing evidence.

{¶ 58} The court, in deciding whether the prejudice that is established by a defendant constitutes "actual prejudice," must balance the claimed prejudice against the remaining evidence in the case, including any newly discovered evidence, to determine whether the missing evidence would have minimized or eliminated the impact of the state's evidence. See *Luck*, 15 Ohio St.3d at 154, 15 OBR 296, 472 N.E.2d 1097. Ultimately, the determination of whether there has been "actual prejudice" involves "a delicate judgment based on the circumstances of each case." *Marion*, 404 U.S. at 325, 92 S.Ct. 455, 30 L.Ed.2d 468; *State v. McClutchen*, 8th Dist. No. 81821, 2003-Ohio-4802, 2003 WL 22099442, ¶ 11. In the instant case, we do not find that the prejudice alleged by Zimbeck as a result of lost alibi witnesses, diminished memories, and missing evidence, when balanced against the remaining evidence in the case, rises to the level of actual prejudice because none of the evidence is clearly exculpatory.

{¶ 59} We further find that the state has established a justifiable reason for the delay. In 1985, Zimbeck passed a polygraph exam. In addition, the investigation at that time led officers to suspect that brothers William and James Little may have been connected to the crime. In particular, a gold watch had been seen in James Little's possession, and a witness identified the watch as belonging to Hill. That witness testified to that matter before the grand jury in 1986. Subsequent-

ly, however, the witness admitted to Detective Forrester that she had lied in her grand jury testimony and that Hill's parents had prompted her to tie the watch to the Littles. It was further determined that other witnesses who had attempted to tie the Littles to the murder had motives for seeing the brothers imprisoned. Finally, the stories told by a number of witnesses who tried to tie the Littles to the murder were simply not supported by the physical evidence.

{¶ 60} In addition, a bloody mattress and underwear were discovered at a purported clubhouse of the Iron Coffin motorcycle club in Lucas County by investigators in 1986. That evidence, however, was never tied to the Hill murder.

{¶ 61} Investigators did not begin to suspect Zimbeck until the cold-case unit gathered the records from the Fulton County and Lucas County investigations and compared them. Then, when Detective Forrester spoke with Zimbeck's mother in December 2008, he first learned that on the night of October 25, when Zimbeck had left his home, he had told his mother that he was going to go find Hill. He also learned for the first time that Zimbeck did not return home until around 2:00 a.m. This was the first time the investigators learned that Zimbeck may have been with Hill on the night she died. It also raises a question as to his whereabouts during the time she was likely killed. Continuing with their investigation, officers then spoke with friends of Hill and learned that at the time of her death, Zimbeck was trying to reestablish their relationship, but Hill was not interested. They also first learned at this time that on October 26, Zimbeck had been seen with scratches on his arms, which he had attributed to a bar fight the night before.

{¶ 62} As the court in *Luck*, 15 Ohio St.3d at 158, 15 OBR 296, 472 N.E.2d 1097, stated: "[A] delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." There is nothing in the record to suggest that the state delayed its prosecution of Zimbeck to intentionally gain a tactical advantage over him. Rather, it was the new evidence, by way of witnesses' statements, that directed investigators' attention to Zimbeck. The lower court determined that because the new evidence was testimonial rather than physical, it could not be viewed as "new" evidence under the standards of *Luck* and other preindictment delay cases. It is well settled, however, that there is "no bright-line distinction regarding the probative force of circumstantial and direct evidence." *State v. Jenks* (1991), 61 Ohio St.3d 259, 272, 574 N.E.2d 492. That is, all classes of evidence have equal probative value. Id., citing *State v. Nicely* (1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236.

{¶ 63} The lower court further disparaged the state's use of Zimbeck's "inconsistent" statements as "new" evidence in the case. Zimbeck's statements to investigators, however, are far more than simply inconsistent. He admitted that both of his 1985 statements were lies. He then tried to reestablish his alibi through his conversations with his mother and Keller. It is well settled that "lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself." *Robinson*, 2008-Ohio-3498, 2008 WL 2700002, at ¶ 202. Similarly, "[t]rying to create a false alibi 'strongly indicates consciousness of guilt.'" *State v. Issa* (2001), 93 Ohio St.3d 49, 67, 752 N.E.2d 904, quoting *State v. Campbell* (1994), 69 Ohio St.3d 38, 47, 630 N.E.2d 339.

{¶ 64} We therefore conclude that the state has shown a justifiable reason for its delay in prosecuting Zimbeck, and accordingly, the lower court erred in dismissing the criminal charges against him. The second assignment of error is well taken.

{¶ 65} Given our ruling on the second assignment of error, we need not address the merits of the first assignment of error. The question raised under that assignment of error will be an evidentiary matter in further proceedings before the trial court.

{¶ 66} On consideration whereof, the judgment of the Fulton County Court of Common Pleas is reversed.

*Judgment reversed.*

OSOWIK, P.J., and SINGER, J., concur.