[Cite as *State v. Adkins*, 2018-Ohio-2588.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-16-042

    Appellee                               Trial Court No. 15 CR 054

v.

Russell Adkins                               **DECISION AND JUDGMENT**

    Appellant                              Decided:  June 29, 2018

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Allen M. Vender,
Assistant State Public Defender, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Wood County Court of Common

Pleas which, following a jury trial, found appellant guilty of murder and sentenced him to

an indefinite prison term from 15 years to life.  For the reasons set forth below, this court

reverses the judgment of the trial court and appellant's judgment of conviction is vacated.

{¶ 2} Appellant, Russell N. Adkins, was indicted by a Wood County Grand Jury on February 18, 2015, for violation of R.C. 2903.02(A), 2903.02(B) and 2929.02(A) for one count of murder of Dana M. Rosendale on or about September 5 through September 11, 1982.

{¶ 3} On April 23, 2015, appellant filed a motion to dismiss due to the 33-year preindictment delay, and on May 4, 2015, appellant filed a separate motion to dismiss due to the disappearance or destruction of evidence favorable to the accused. Appellee opposed both motions. After consolidated hearings on the motions and post-hearing briefing, on June 24, 2015, the trial court denied both motions to dismiss.

{¶ 4} Following an initial jury trial, the jury reached an impasse in its deliberations. On January 28, 2016, the trial court declared a mistrial.

{¶ 5} A second jury trial was held from July 11 through 15, 2016. At the conclusion of appellee's presentation of its case, appellant renewed his motion to dismiss due to preindictment delay, which appellee opposed, and the trial court again denied the motion. Following the conclusion of the trial, on July 16, 2016, the jury found appellant guilty of murder in violation of R.C. 2903.02(A), an unclassified felony.

{¶ 6} Then on July 18, 2016, the trial court sentenced appellant to serve an indefinite prison term of 15 years to life pursuant to R.C. 2929.02(B)(1). The trial court journalized the sentencing judgment entry on July 20, 2016.

{¶ 7} It is from the trial court's sentencing judgment entry to which appellant filed his appeal on August 18, 2016.

2.

**{¶ 8}** Appellant sets forth two assignment of error:

I.  The trial court erred when it denied Russell Adkins's motions to dismiss for preindictment delay.  *State v. Luck*, 15 Ohio St.3d 150, 472 N.E. 2d 1097 (1984); *State v. Jones*, Slip Opinion No. 2016-Ohio-5105; *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Ohio Constitution; December 11, 2014 [sic], Sentencing Hearing, Tr. 24-26 [sic]; June 24, 2015, Entry; Tr. 1082-83.

II.  The trial court abused its discretion when it allowed the former Wood County Prosecutor to testify that she wanted to prosecute Adkins while she was in office, and did not do so only because she wanted to build a stronger case against him.  *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984); *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990); Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Ohio Constitution; Evid.R. 401; Evid.R. 403; Tr. 824-857.

### I.  Actual Prejudice

**{¶ 9}** Appellant's first assignment of error alleges actual prejudice from a violation of his due process rights because of the 33-year delay from 1982 until his 2015 indictment.

## A. Legal Standard

{¶ 10} This court has held that preindictment delay violates due process when two factors are shown for the delay: it caused actual prejudice and was unjustifiable. *State v. Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, ¶ 37, citing *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 12. The defendant bears the initial burden of presenting evidence of actual prejudice, and, if successful, then the burden shifts to the prosecution to present evidence of delay justification. *Id.*, citing *Jones* at ¶ 13.

{¶ 11} "In reviewing the trial court's decision on a motion to dismiss for preindictment delay, we give deference to the trial court's findings of fact, but review the court's application of the law to the facts de novo." *Id.*, citing *State v. Zimbeck*, 195 Ohio App.3d 729, 2011-Ohio-2171, 961 N.E.2d 1141, ¶ 20 (6th Dist.). "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id.* at ¶ 38, citing *Jones* at ¶ 28.

{¶ 12} Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence is exculpatory when it is "favorable to an accused." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

4.

{¶ 13} To determine actual prejudice, we must employ "'a delicate judgment' and a case-by-case consideration of the particular circumstances." *Jones* at ¶ 20, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52. We "must 'consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay.'" *Id.* Demonstrable evidence of faded memories, unavailable witnesses or lost evidence might satisfy the actual prejudice requirement. *Id.* at ¶ 21.

## B. Analysis

{¶ 14} Appellant argues the trial court erred when it twice denied appellant's motion to dismiss for preindictment delay. Appellant urges us to find appellee's 33-year delay before commencing prosecution for an alleged 1982 murder was actually prejudicial and unjustified. In response, appellee argues appellant's motions to dismiss were properly denied because he failed to provide "concrete proof of actual prejudice in his prosecution occasioned by the delay in charges being filed."

{¶ 15} The record shows the trial court originally denied appellant's motion to dismiss for preindictment delay because appellant failed to meet his "burden of demonstrating actual, substantial prejudice resulting from the delay." The trial court's June 24, 2015 journalized entry states, in part:

> In this case, during the nearly three decades that passed between Ms. Rosendale's death and Mr. Adkins' indictment two witnesses died and the state lost or destroyed a dozen pieces of evidence. Mr. Adkins has not

presented proof that demonstrates in a specific, particularized, and non-speculative manner that any of the lost evidence or dead witnesses' testimony would help prove his defenses, however. The information brought forth at the hearings indicates that the value of the missing evidence is speculative at best; Mr. Adkins presented no concrete proof that the lost evidence and witnesses would help exonerate him. This is insufficient to meet the defendant's burden to dismiss for pre-indictment delay. * * *

The evidence Mr. Adkins presented at the hearing on the motions to dismiss does not rise to the level of concreteness seen in *Luck*. * * * Mr. Adkins claims that the death of the woman who called 911 the night of the incident is prejudicial, but does not provide any information that would allow the court to determine what the witness might have said that would help exonerate him. Nor does Mr. Adkins provide any proof that the contents and import of the missing evidence cannot be gleaned from the remaining witnesses and evidence. For example, Mr. Adkins complains that the photographs from the scene are no longer available. But the state has a witness who was at the scene the night of the incident and who did the accident reconstruction work, and who can testify to the information that would have been available from the missing photographs. Though the actual photographs would be preferable, Mr. Adkins still has access to the

information from them and can still use that information to defend against the charges against him. Mr. Adkins has not presented *concrete* proof that the missing evidence and witnesses will prejudice his defense, and his case is distinguishable from *Luck*. (Emphasis in original.)

{¶ 16} The record also shows at the second trial appellant renewed his motion to dismiss for preindictment delay due to actual prejudice from faded memories, evidence lost or destroyed and "the indictment [is] based on nothing more than was available [in 1982] and is not based on new technology." In response appellee argued to the trial court:

{¶ 17} Your Honor, in this case we have an exhumation of the body and the skull because, as Dr. Scala-Barnett has testified, Dr. Fazekas did not do a complete autopsy. And based upon that and with the advancement in technology and the use of the forensic anthropologist, that is an advancement, that does change things, and there were further witnesses that were identified that were not identified previously.

{¶ 18} Appellant then argued in rebuttal to appellee's arguments:

{¶ 19} Not one person has testified that there is a new technology that has led to this indictment. With respect to whether or not a full autopsy was completed, I think everyone has acknowledged that Dr. Fazekas could have done what Dr. Barnett did and chose not to. And Dr. Symes acknowledged that forensic anthropology was around at the time and has been around since.

7.

**{¶ 20}** The trial court judge then stated, "We will deny the motion to dismiss for preindictment delay."

## 1. Exculpatory Value of Missing Evidence

**{¶ 21}** We find the correct standard of appellant's burden to show actual prejudice was articulated by the Ohio Supreme Court in *State v. Jones*, as it reviewed a decision of the Eighth District Court of Appeals:

> We reject the Eighth District majority's application of an amorphous standard based on concepts of fundamental justice to determine the existence of actual prejudice. But we also reject the majority's characterization of the alternative standard as requiring the loss of evidence with demonstrably exculpatory value that goes beyond attacking the credibility of the state's evidence. Each time this court has considered preindictment delay, we have scrutinized the claim of prejudice vis-à-vis the particular evidence that was lost or unavailable as a result of the delay and, in particular, considered the relevance of the lost evidence and its purported effect on the defense.

*Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 23, citing, *e.g., Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, at ¶ 52.

**{¶ 22}** The Ohio Supreme Court also addressed the level of "concreteness" required to show actual prejudice:

8.

Nevertheless, we reject the state's suggestion that any claim of actual prejudice based on the death of a potential witness is too speculative to succeed unless the defendant can establish precisely what that witness would testify to and that the testimony would be directly exculpatory.

*Jones* at ¶ 27.

{¶ 23} Before the Ohio Supreme Court remanded the matter to the court of appeals, it explained why *State v. Luck*, involving a 15-year preindictment delay, properly found actual prejudice:

We reasoned, "[I]t cannot be said that the missing evidence or the dead witnesses would not have minimized or eliminated the impact of the state's circumstantial evidence" connecting Luck to the murder. For example, one of the dead witnesses was purportedly with Luck at the time of the alleged murder, and Luck described that witness as the one person who could have helped her defense. Although there was no record establishing what that witness would have actually testified to, Luck was "obviously prejudiced by not being able to seek verification of her story from [the witness] and thereby establish mitigating factors or a defense to the charge against her." Thus, the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the

9.

state's evidence against a defendant, and thereby aid in establishing a defense, may satisfy the due-process requirement of actual prejudice.

*Id.* at ¶ 25, quoting *State v. Luck*, 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984).

{¶ 24} Moreover, the Ohio Supreme Court instructs us to consider "the unavailable evidence in light of the other evidence available at the time of the indictment and in light of its relevance to the defense." *Id.* at ¶ 26, citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 103.

### a. Death of Dr. Fazekas and the Missing Autopsy Photographs

{¶ 25} Appellant argues he was actually prejudiced because the "forensic pathologist whose autopsy exculpated Adkins had passed away, and the pictures taken at that autopsy had vanished." In 1982, Dr. Steven Fazekas was a Lucas County deputy coroner under then-coroner Dr. Harry Mignery. On September 11, 1982, Dr. Fazekas was the forensic pathologist who conducted the autopsy of Ms. Rosendale's body when it was still "warm to the touch," took photos during the autopsy, and wrote a report concluding the victim's cause of death was blunt force trauma to the right side of the head and the manner of death was undetermined. The record shows Ms. Rosendale's body was found by emergency medical personnel of the Northwood Fire Department on September 5, 1982, adjacent to Tracey Road. The Northwood Fire Department was dispatched after a neighbor, Karen Danhar, called 911. The victim was transported to St. Charles hospital where she remained on life support for six days until she passed away on September 11, 1982.

10.

{¶ 26} Appellant argues Dr. Fazekas's decision not to classify "homicide" as the manner of the victim's death was exculpatory. Consequently, appellant claims he was actually prejudiced by not being able "to call Dr. Fazekas as a witness to explain and defend the opinion he reached in his report" and to rebut Dr. Scala-Barnett's criticisms of Dr. Fazekas's autopsy methods and report. According to appellant, he "was similarly prejudiced by not having [the now missing] pictures of the autopsy to support Dr. Fazekas's determination that the cause of death could not be ruled a homicide." All forensic pathologists and forensic anthropologists agreed "that the body was in the best condition to be examined at the first autopsy" conducted by Dr. Fazekas. Thus, appellant argues, Dr. Fazekas had the most accurate findings because he saw the fresh trauma to Ms. Rosendale.

{¶ 27} Appellant raises three areas of actual prejudice evidence related to Dr. Fazekas's unavailability: undetermined classification of death, skin abrasions, and skull fractures.

### i. Undetermined Classification of Death

{¶ 28} Appellant argues the significance of the exculpatory nature of Dr. Fazekas's missing testimony is reflected in the testimony by former Wood County Prosecutor Betty Montgomery that "with all the evidence that was available in 1982, Montgomery believed that Dr. Fazekas's findings would likely preclude the State from obtaining a conviction." Dr. Fazekas's determination to classify Ms. Rosendale's death as "undetermined" remained unchallenged from 1982 until 2014, a period of 32 years,

until Dr. Scala-Barnett formed her opinion in favor of "homicide." The decision by appellee to not indict appellant also remained unchallenged during the entire period of the "undetermined" classification and continued until 2015, a period of 33 years.

{¶ 29} It is undisputed in the record Dr. Fazekas was deceased well before the 2015 indictment, and Dr. Mignery, who might have been alive then, was not located by law enforcement.

{¶ 30} The record shows appellee commenced prosecution only after the exhumation of the victim's body in 2013 and a new coroner's "homicide" classification for the victim's manner of death. Appellee argued at the second trial appellant inflicted massive trauma to Ms. Rosendale's head in at least three separate locations with a narrow elongated object, such as a pool cue stick. Appellant presented evidence to rebut appellee's case with the explanation the victim suffered massive head trauma because she fell out of his moving car due to a faulty passenger door latch.

{¶ 31} Both appellant and appellee witnesses agreed the victim died of head trauma, but they disagreed on what the head trauma represented. If the head trauma was three to four separate impact injuries to the skull, certain witnesses opined Ms. Rosendale's injuries were consistent with appellant beating her with a narrow elongated object, suggesting homicide. If the head trauma was a single impact resulting in a triangular skull fracture pattern, certain witnesses opined Ms. Rosendale's injuries were consistent with her falling out of a moving vehicle, suggesting an accident.

12.

**{¶ 32}** A forensic pathologist, whose job it is to determine cause and manner of death, has only five classification options for manner of death: natural, suicide, accident, homicide, or undetermined. Cause of death was described by witnesses as answering why a person died, and manner of death as answering how that death came about. The record contains evidence from four forensic pathologists: Drs. Fazekas (through his 1982 autopsy report); Scala-Barnett, Spitz, and Diaz. All four pathologists agreed the cause of Ms. Rosendale's death was craniocerebral injuries, but they disagreed on the manner of death.

**{¶ 33}** In 1982, Dr. Fazekas chose the "undetermined" classification following the original autopsy. In 2014, Dr. Diane Scala-Barnett, who was mentored by Dr. Fazekas, chose the "homicide" classification following the first exhumation of the body on October 9, 2013. Following the second exhumation of the body on April 15, 2016, Dr. Werner Spitz, who trained Dr. Fazekas, would probably chose the "undetermined" classification. "[W]ould I have signed the death certificate undetermined? I probably would have done that too * * * based on the paucity of material that I have." In 2016, also following the second exhumation, Dr. Francisco Diaz specifically affirmed the "undetermined" classification due to the missing original reports and investigation materials.

**{¶ 34}** On January 14, 2014, Dr. Diane Scala-Barnett speculated that Dr. Fazekas probably chose "undetermined" in 1982 to leave open the possibility of a future change to the death certificate:

13.

Q: Why would [Dr. Fazekas] classify [the manner of death] as undetermined?

A: I can't speak for Dr. Fazekas, but he probably felt – * * * [Undetermined] means that you do not have enough information available at the time of the autopsy findings that are consistent with the story about why the person is there, things don't jive, things don't make sense, things are inconsistent with what would you expect the findings to be, so you call it undetermined, and that leaves you an open opportunity if more information comes to you later.

{¶ 35} Dr. Scala-Barnett insisted Dr. Fazekas did not do a "full" or "complete" autopsy because he did not have the skull cleaned the way she did during her autopsy. She also criticized Dr. Fazekas's thoroughness because by the time John Helm, the Wood County Prosecutor's Office Investigator for 37 years until 2014, contacted her for "what we still had available in the way of reports or pictures or photographs from the original autopsy," she only found the original autopsy report and drawing, but no photographs, toxicology report, 35-millimeter slides or Polaroids, which she claimed was typical of the cold cases involving Dr. Fazekas's autopsies.

{¶ 36} Dr. Diaz separately formed his opinion of Dr. Fazekas's classification of Ms. Rosendale's death by testifying, "I believe Dr. Fazekas was right when he classified the manner of death as undetermined, lack of injuries that indicate inflicted trauma, in my opinion, as well as several elements that are missing from the investigation and from the

case." Rather, the victim's injuries "on the back of her head on the right side of her head as well as an abrasion on the right shoulder and the elbows * * * are consistent with a fall from [the passenger side of] a vehicle, just the location, the characteristics, and the extent." He opined her injuries were not consistent with inflicted trauma to the head because "you would tend to see breaks on the skin, lacerations, and you tend to see multiple contusions. You tend to see defensive-type injuries because * * * you are the victim of inflicted trauma, the natural reaction will be to ward off those – using your upper extremities or, if you fall to the ground, with the lower extremities as well. And in the case of Ms. Rosendale, there is no evidence of defensive-type injuries, either in the upper extremities or the lower extremities."

{¶ 37} Dr. Spitz also separately formed his opinion of why Ms. Rosendale's death cannot be classified as a "homicide" because it "is a first rate example of a fall versus an inflicted injury. He found Ms. Rosendale died from "a single impact whether she fell or jumped out of a moving vehicle or in some way came out of a vehicle and her head made contact with the ground by falling on the ground forcefully such that her head and back of the right side of her head hit the ground when she fell backwards sustaining the injuries to each elbow and the right shoulder."

{¶ 38} When reviewing the unavailability of Dr. Fazekas in light of the other evidence available at indictment and in light of its relevance to appellant's defense, we find that whatever Drs. Spitz and Diaz testified to indicate support for Dr. Fazekas's opinion could not substitute for Dr. Fazekas who performed the original autopsy when

Ms. Rosendale's body was still warm to the touch and the trauma was still "fresh." It is undisputed Dr. Fazekas had access to all the information that was missing by 2015. Appellee's constant attacks on Dr. Fazekas that he did not properly conduct a "full" or "complete" autopsy and erred by not ruling Ms. Rosendale's death as "homicide" necessarily centered on speculations of what Dr. Fazekas saw and why he did what he did, which witnesses admitted only Dr. Fazekas could answer. The record does not contain any reports, recordings or transcripts of any interviews conducted with Dr. Fazekas during his lifetime. Significantly, Dr. Fazekas's "undetermined" classification of Ms. Rosendale's death was unchallenged for 32 years.

{¶ 39} Contrary to the trial court's June 24, 2015 decision, the "contents and import" of Dr. Fazekas's missing testimony cannot be "gleaned from the remaining witnesses and evidence." We find the unavailability of Dr. Fazekas to testify at the second trial was relevant to appellant's defense and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms. Rosendale to death and bolster appellant's defense she accidentally fell out the passenger door of his moving car.

### ii. Skin Abrasions

{¶ 40} The record shows appellee's witnesses ceaselessly questioned and criticized Dr. Fazekas's ability to correctly see and document the victim's skin abrasions, along with facial swelling. They argued the lack of skin abrasions should have been obvious to Dr. Fazekas, and could not support an accidental fall from appellant's moving

car. Dr. Fazekas's autopsy report identified abrasions on the victim's back of right shoulder and on each elbow, and no skin cuts/welts or lacerations or facial swelling. The record shows that despite two exhumations of the victim's body, her skin abrasions were never tested to determine if they were from a disease process or injury.

{¶ 41} Tammy Friess testified at the second trial she was the victim's friend and visited her in the hospital on September 5, 1982. Ms. Friess said she saw a "red welt" on the back of the victim's neck which "was so red and so prominent." She insisted Dr. Fazekas's autopsy failing to identify the "red welt" was wrong.

{¶ 42} Deborah Risner, the victim's sister, also directly contradicted Dr. Fazekas's autopsy report. Ms. Risner testified that she visited the victim in the hospital on September 5, 1982, and claims Dr. Fazekas wrongly identified Ms. Rosendale's skin abrasions:

> A: I lifted her gown, and I checked * * * her right leg, I checked her left leg, her arms, her hands. She did not have one scuff mark, one bruise, one abrasion. She had nothing, absolutely nothing but a swollen eye, a swollen face, and brain tissue leaking out of * * * her right ear, just her ear.
>
> * * *
>
> Q: And if a medical doctor later identifies [the skin condition on the victim's elbows] as abrasions, you're saying those medical doctors are mistaken, it's actually psoriasis?

A: The severity of the psoriasis that she had on her elbow could be – absolutely could be like an abrasion, a small abrasion.

{¶ 43} Ron Billings, a Northwood Fire Department emergency medical first responder on September 5, 1982, also directly contradicted Dr. Fazekas's autopsy report. He recalled thinking how he found the victim "was very suspicious." He "did not see any road rash at all that [he] observed." Mr. Billings testified he found the victim "laying on the berm of the road in the grassy area." He described her as "a young woman laying on her side with her head down and legs kind of bent up, kind of in a fetal position." When he straightened her head and rolled her on her back, there were "blood and spinal fluids" from the back of her head. "At the time I seen [sic] two other injuries on her. One was on her elbow, it was about the size of a quarter to a half-dollar. The other was on her ankle, quarter to a half dollar, small abrasions, not large."

{¶ 44} Dr. Scala-Barnett also directly contradicted Dr. Fazekas's autopsy report by concluding Ms. Rosendale "died of blunt force injuries of the head due to a beating, and I ruled it a homicide." She described the injury pattern as a skull depression between two blunt force trauma injuries. One factor for that conclusion was the victim "had no road rash at all," and she did not see the same abrasions that Dr. Fazekas documented in his autopsy. Dr. Scala-Barnett then opined that she believed the victim was beaten with "something that was heavy, * * * that is long, round, smooth, because there's no lacerations on the back of the head. There's nothing that's picking up a tool mark from a weapon on the scalp or the skull."

18.

{¶ 45} Steven Symes, Ph.D., a forensic anthropologist, also directly contradicted Dr. Fazekas's autopsy report. Although Dr. Fazekas did not identify any of Ms. Rosendale's injuries as defensive wounds, Dr. Symes still believed the abrasions identified by Dr. Fazekas were defensive wounds. "Maybe it's in self-defense. Maybe it's a fleeing technique." Dr. Symes opined that "wounds don't always show up on the body * * * they don't always show up in a fresh autopsy either."

{¶ 46} Dr. Spitz formed his own opinion based on the evidence available at that time. The abrasions noted in Dr. Fazekas's autopsy were significant to support the manner of death as falling from the passenger side of a moving car. "In short, the location and what I see in an injury tells me what occurred such that abrasions or bruises or both on the elbows, on the shoulder is very significant because it is a pattern." He testified, "There is abundant evidence of a great force that one blow caused this [triangular skull fracture with an extended fracture in the base of the skull] without breaking the skin because * * * the impact was on a * * * very firm surface." Dr. Spitz stressed the importance of the consistency of Ms. Rosendale's injuries with falling out of a moving car rather than a beating. "[T]he injuries that she presents are entirely and completely without really any evidence of inconsistencies that she fell out of the car or she jumped out of the car or she somehow fell out of the car, and I have no evidence to the contrary either. So I test it in my mind, what is likely and is there evidence to the contrary. There is no evidence to the contrary."

19.

{¶ 47} Dr. Diaz also formed his own opinion. He also found the abrasions noted in Dr. Fazekas's autopsy were significant to support Ms. Rosendale fell from the passenger side of a moving car. "To me they indicate a pattern, which is the location and extent of the injuries, and that pattern is consistent with Ms. Rosendale being the passenger of a motor vehicle and striking the ground." The lack of lacerations on the back of the victim's head were significant to indicate the victim was not beaten to death with a narrow elongated object, as proffered by appellee.

> And the question I ask myself, if Ms. Rosendale was the victim of inflicted trauma, and according to Dr. Symes * * * she sustained at least four impacts that created fractures, then there were more that did not, and the more instances where the person is hit with a narrow object over the skull, you would expect to have lacerations. And we do not see lacerations, any laceration, not even a small one, * * * not a single break in the skin, and to me that's what I believe. It is my opinion that this is not inflicted trauma with a narrow elongated object.

{¶ 48} Once again, when reviewing the unavailability of Dr. Fazekas in light of the other evidence available at indictment and in light of its relevance to appellant's defense, we find that whatever Drs. Spitz and Diaz testified to indicate support for Dr. Fazekas's opinion could not substitute for Dr. Fazekas himself who performed the 1982 autopsy when Ms. Rosendale's body was still warm to the touch and the trauma was still "fresh." It is undisputed Dr. Fazekas had access to all the information that was missing

20.

by 2015. Every witness with medical training testified that he or she did not know what Dr. Fazekas was thinking when he did or did not do an act with respect the original autopsy. As Dr. Diaz explained, "What Dr. Fazekas had at the time [of the victim's death] * * * was the advantage of doing the examination himself. An autopsy means in Greek to see with your own eye. He saw it. The rest of us haven't seen it. He saw the patient when she died and examined the patient."

### iii. Skull Fractures

{¶ 49} The record also shows appellee's witnesses ceaselessly questioned and criticized Dr. Fazekas's ability to correctly see the victim's head trauma through skull fractures. Dr. Fazekas described the skull fractures in his autopsy report as follows and drew an accompanying diagram generally referred to by each expert witness as a triangular fracture pattern:

A 4" in diameter purple bruise is behind the right ear, extending into the upper neck. Brain matter is present in the right ear canal. Reflection of the scalp reveals subgaleal hematoma over the right half of the skull and over the occipital area. The bones of the calvarium are not fractured. * * * Stripping of dura from the base of the skull reveals a fracture line along the right petrous bone into the sella, a roughly transverse fracture line of the occipital squama extending from right to left across the midline and a roughly sagittal fracture line of the right occipital fossa, connecting the two former fracture lines.

21.

{¶ 50} Dr. Fazekas's original 1982 autopsy photos were missing by the time of the 2015 indictment. Also missing from the 1982 autopsy file were all accompanying documents provided to or requested by Dr. Fazekas, such as police reports, lab test results, hospital medical records, scene photographs, the victim's clothing, and witness statements.

{¶ 51} Julie Saul, a forensic anthropologist consultant to Dr. Scala-Barnett in this matter, directly contradicted Dr. Fazekas's interpretation of a triangular skull fracture pattern. The record shows Mrs. Saul cleaned Ms. Rosendale's skull after the 2013 exhumation by "gently [simmering it] in a solution of water, trisodium phosphate and BIZ." The process to remove all tissue from the skull continued overnight until "sufficient tissue had been removed to allow careful inspection." As a result of that cleaning, Mrs. Saul concluded, "There are indications through looking at the fracture patterns of these really distinct strong blows with a blunt object." Mrs. Saul's report states, "Fracture patterns suggest the presence of THREE severe blunt impacts to the right/posterior skull (occiput and temporal), producing multiple radiating and other associated fractures, several involving the skull base." (Emphasis in original.) In an addendum to her report Mrs. Saul identified a fourth "blow" to the victim's head that she believed was "further evidence that Dana Rosendale sustained multiple blows to the head."

{¶ 52} At one point Mrs. Saul testified as she pointed to a portion of the skull (unidentified in the transcript) that one particular fracture "actually shows up better

22.

before I cleaned it, because when I cleaned it, I took out what was making it more visible, but it still needed to be cleaned." At another point Mrs. Saul testified after the first exhumation she "packaged" Ms. Rosendale's skull for reburial in a new casket because the first casket was found with water in it. When the second exhumation occurred, she was present and audibly gasped that the skull "was not packaged as I recall packaging it," but then concluded there was no damage because all the bones could still be accounted for. She believed someone in the coroner's office must have "repackaged" the skull in the new casket. Mrs. Saul also acknowledged during her testimony that she glued a piece of the skull (also unidentified in the transcript) in a location that was not original because that piece "was held just by the soft tissue gunk" that she removed during her cleaning process. "[The piece] no longer had something holding it together so I put it back in here."

{¶ 53} Dr. Scala-Barnett also directly contradicted Dr. Fazekas's autopsy interpretation of Ms. Rosendale's skull fractures. "My opinion [is] * * * the fracture patterns on the skull were not consistent with somebody falling out of an automobile, a moving automobile, onto pavement." Dr. Scala-Barnett testified Dr. Fazekas's autopsy drawing of the victim's skull only showed one-third of the fractures speculating because "he probably didn't see it all." As a result, she considered Dr. Fazekas's autopsy as incomplete because he "omitted some procedures" and did not consult with a forensic anthropologist, such as Mrs. Saul, to clean the skull. "There was [sic] a lot of things Dr. Fazekas omitted in his examination. * * * Dr. Fazekas did not have any of the bone

23.

cleaned. * * * And he would have seen the fracture pattern better had he had an anthropologist help him."

{¶ 54} Dr. Scala-Barnett further criticized why Dr. Fazekas drew his skull drawing as he did because, "We know that we don't have [a triangle fracture pattern]. * * * Three distinct patterns, three distinct blows. These are not radiating fractures from one blow. * * * That's my opinion."

Q: And you don't know whether Dr. Fazekas drew this diagram to be just demonstrative of the main fractures, right?

A: I don't – I can't speak for him. I don't know what he did.

Q: Similarly – so you can't say for certain based on this drawing that he didn't see the fractures, right?

A: Well, if he saw the fractures, why didn't he draw them on the diagram?

Q: That's what I'm asking. You can't say whether he just drew this for demonstrative purposes, he didn't do all of the fractures, but he just provided here are the main fractures I see?

A: There's – not all the fractures are documented on there. I don't know why * * * if he saw them, why he didn't put them on there.

{¶ 55} Dr. Symes also directly contradicted Dr. Fazekas's interpretation of a triangular skull fracture pattern from a single blow. He testified he believed the victim's skull fractures were not consistent with falling out of a car because he did not view the

injuries as resulting from "a random nature of tumbling down a highway." Rather, Dr. Symes saw the injuries as three separate impacts with radiating fractures that "contribute to what looks like focused impacts that are separate from each other," even though he, along with other witnesses, acknowledged Dr. Spitz was a legend in the field of blunt force trauma.

{¶ 56} Dr. Spitz formed his own opinion that Ms. Rosendale was not beaten "based on the material that I had. * * * Not on the material that I don't have." Dr. Spitz testified he saw the head injury originating at the bottom of the skull and a "triangular fracture * * * definitely a triangle" or, put another way, a "single impact in a focused area" resulting in the triangular fracture. Dr. Spitz explains his opinion using the "seesaw mechanism" analogy of how the skull reacted to the single impact/blow and a triangle piece of the victim's skull was "knocked out" because "the facts speak for themselves * * * I just point out to the jury and to you that this fragment was knocked out by a single blow right here [from falling out of a car]. That's what I'm saying." He insisted Ms. Rosendale's head was not beaten in because she had no depressed skull fractures and no skin lacerations.

> There had to have been a [skin] laceration [for a depressed skull
> fracture] * * * because there is penetration * * * that something * * * went
> through the skull * * * from the outside to the inside. * * * There's * * * no
> mention of any laceration [in Dr. Fazekas's autopsy], nor did I see in the
> skin that was with the body when the body was exhumed that there was any

25.

such thing, and I did not see any tear like that in photographs taken during the first and second exhumation.

{¶ 57} Dr. Diaz also formed his own opinion that Ms. Rosendale was not beaten. "[Dr. Fazekas] saw the [triangular] pattern of the fracture, he made a diagram of it, and he included those into his autopsy report and into his opinions and into his list of diagnoses." Dr. Diaz testified Ms. Rosendale's skull had no depressed fractures because of the lack of lacerations. "[Y]ou expect to see a multiplicity of injuries, namely lacerations, breaks in the skin * * * Once you strike a prominent feature, it will create a crushing injury that eventually will tear [the skin]."

{¶ 58} Once again, appellant was unable to attack the credibility of appellee's evidence, in turn, specifically attacking Dr. Fazekas's autopsy performance and conclusions. Dr. Fazekas was unavailable to respond to these attacks on his ability to correctly see and document the victim's head trauma through skull fractures. Appellant's rebuttal testimony by Drs. Spitz and Diaz, who formed their own opinions, at best supported their speculations of why Dr. Fazekas did what he did. However, those speculations were clearly no substitute for testimony from Dr. Fazekas himself who performed the original autopsy and documented everything he saw with photographs that were lost or destroyed during the 33-year delay. We are also mindful of the issue of evidence alteration after the second autopsy because at least one witness opined Mrs. Saul's actions irreparably damaged the skull, an undisputedly critical piece of physical evidence, and possibly not only enlarged the existing fractures but also caused new ones.

26.

### b. Missing Evidence Originally Available in 1982

{¶ 59} Next, appellant argues he was actually prejudiced because the "purported murder weapon, Adkins's car with a faulty door, pictures of the scene . . . all gone." The missing evidence, appellant argues, would be consistent with Ms. Rosendale's injuries from an accidental fall. "The injuries Rosendale sustained were on the right and back side of her head, right shoulder, and both elbows, which is consistent with falling from the passenger side of a vehicle." Appellant urges us to find actual prejudice because if "there had not been a 33-year pretrial delay, Adkins could have demonstrated that the car had a faulty door to bolster his defense."

{¶ 60} In response, appellee argues appellant failed to meet his burden of showing bad faith destruction of evidence because "the delay was not caused by any nefarious motives on behalf of the State, as any lost evidence is not relevant to the way Dana died" and was "destroyed as a matter of normal practice by law enforcement." Contrary to appellee's assertion, appellant does not have the burden to show "bad faith" with actual prejudice. *Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, at ¶ 38.

{¶ 61} Appellant raises five areas of actual prejudice evidence related to missing exculpatory evidence: other witness unavailability, trial court judgment entry, appellant's car, victim's clothing, and faded memories.

### i. Witnesses Unavailable at Time of Indictment

{¶ 62} In addition to Dr. Fazekas, the record also confirms the unavailability at the time of the 2015 indictment of testimony by a witness, Karen Danher, who lived in the

trailer park off Tracey Road near the location Ms. Rosendale was found. Ms. Danher was awakened by appellant the early morning of September 5, 1982, and he asked her to call 911 for the victim because she had fallen out of his car. Ms. Danher made the 911 call, and that is how Mr. Billings arrived at the scene and began medical treatment to Ms. Rosendale. Appellant argues Ms. Danher's testimony would support appellant's defense that upon discovering Ms. Rosendale accidentally fell out the passenger door, he urgently sought to get Ms. Rosendale medical attention. The record also shows another potential witness, Robert Pearce, who "was a neighbor who had seen the defendant turn around," would support appellant's defense that upon discovering Ms. Rosendale accidentally fell out the passenger door, he immediately turned around to attend to her.

{¶ 63} The record includes state's exhibit No. 2, appellant's written statement to the police dated September 5, 1982, which states in part:

> Back on I-75 to Miami St. exit, got off there along Miami to Oakdale. I decided to go see if I could get some cigarettes before going home. So I turned on Tracey Rd. to go by the Convent Food Mart at Wales and Tracey. Approaching that corner I heard my car noise get louder and my car door close. At which time I thought Dana had fallen out of the car. I stop as soon as possible to turn around to get her help or whatever.

{¶ 64} Appellant specifically points to the unavailability of Ms. Danher during the preindictment delay as meeting his burden to prove actual prejudice. According to appellant Ms. Danher was an exculpatory witness who would have helped exonerate him

28.

because, "Danher could have testified that Adkins banged on her door in the middle of the night to get help for Rosendale, which is more consistent with an accidental injury than a homicide."

{¶ 65} Mr. Helm testified the identity of Ms. Danher was known to the police since 1982 because "she was the reporting party when the initial report [by the Northwood Police Department] was made." However, no interview of Ms. Danher occurred since 1982 and prior to her death. The record shows sometime after 2006 Mr. Helm attempted to contact Ms. Danher and learned of her death in the '90s. The record of the second trial, however, does not contain the police report nor any recording or transcript of Ms. Danher's 911 call or of the police interview with her during Ms. Danher's lifetime.

{¶ 66} Contrary to the trial court's June 24, 2015 decision, the "contents and import" of Ms. Danher's missing testimony cannot be "gleaned from the remaining witnesses and evidence." We find the unavailability of Ms. Danher to testify at the second trial is relevant to appellant's defense and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms. Rosendale to death and bolster appellant's defense she accidentally fell out of his moving car.

### ii. Physical Evidence Cited By Trial Court

{¶ 67} The large volume of missing physical evidence is undisputed. In its June 24, 2015 judgment entry, the trial court stated, "From 1985 to 2012, no investigation [by the Northwood Police Department] took place. * * * The information from the

29.

second autopsy is the only new physical evidence the state discovered in its 2012 investigation." The trial court then itemized the missing evidence raised by appellant as grounds for his motion to dismiss: 1) Dr. Fazekas, 2) Ms. Danher, 3) the recording of Ms. Danher's 911 call, "though it was detailed in the original police report from 1982 and the dispatch logs from that evening are available," 4) the "two vehicles at the scene the night of the incident," 5) Ohio Bureau of Motor Vehicles records identifying the owners of the two vehicles, 6) "photographs taken at the scene of the incident," 7) "map of the scene drawn by [accident reconstructionist Fred Gray] on September 5, 1982," 8) St. Charles Hospital medical records for Ms. Rosendale from September 5 to September 11, 1982, 9) Ms. Rosendale's clothes worn "at the time of the incident," 10) appellant's car, 11) any examination of appellant's "car's passenger door latch," 12) Dr. Fazekas's autopsy photographs, 13) the "pool cue found at or near the scene," and 14) "the only evidence the NPD had listed in its evidence logs as relating to the Dana Rosendale investigation – a purse and some fiber evidence." In particular, appellant identifies the missing physical evidence of his car with the faulty passenger door latch and Ms. Rosendale's clothing as exculpatory and relevant to his defense. We note that "the original police report from 1982 and the dispatch logs from that evening" identified by the trial court are not in the record of the second trial.

{¶ 68} Robert Bratton, the Northwood police detective in charge of the criminal investigation from 1982 until 1993, testified that all physical evidence and medical records pertaining to his investigation of this case was kept by the Northwood Police

30.

Department. Jeff Zahradnik, a Northwood police officer who began investigating the case in 2009, testified by 2009 he did not "find any physical evidence associated with this case." The only item he found was a 2003 "destruction order" from Perrysburg Municipal Court for "a purse with some contents, I believe a fiber, and a cassette tape. * * * I believe the cassette tape was a taped interview between Mr. Helm and Russell Riches." Mr. Riches did not testify at the second trial.

{¶ 69} Mr. Zahradnik found information indicating there once was also a pool stick "submitted to BCI for investigation." Dr. Scala-Barnett and Mrs. Saul both testified that a long, narrow object, like a pool stick, could have been the murder weapon. Mr. Bratton testified the pool stick was collected in the vicinity of the crime scene by Ron Cowell, a patrolman with the Northwood Police Department, and entered into the police property room. No witness could clearly recall if appellant had a pool stick in his car on September 5, 1982. The record shows state's exhibit No. 4 indicates a pool stick was submitted September 7, 1982, to the Ohio Bureau of Criminal Identification and Investigation and analyzed on September 24, 1982. The BCI analysis indicated no blood found on the pool cue stick, but found some plant material and various, generic white and orange fibers. Appellant argues that had the pool stick been located and DNA tested, the results would be exculpatory and diminish or minimize appellee's theory of appellant beating Ms. Rosendale to death with a long, narrow object, like a pool stick.

{¶ 70} Mr. Billings testified he took personal notes on September 5, 1982, because he "figured something would be going to trial in the near future, and I felt that it needed

31.

to be recorded so I could remember what happened." However, he threw them out about seven years prior to the second trial because neither law enforcement nor the prosecutor's office ever asked for any of his personal reports. "I said well, this has been 25 years so we don't need them, and I threw them away at that time."

{¶ 71} We find the volume of physical evidence available in 1982 but unavailable in 2015 is significant. We also find the trial court's evaluation of no actual prejudice from the lack of physical evidence to be misplaced. In its June 24, 2015 judgment entry, the trial court specifically referred to the testimony by the accident reconstructionist as providing appellant with access "to the information that would have been available from the missing photographs" for his defense.

{¶ 72} Fred Gray is the accident reconstructionist. Mr. Gray testified at the second trial, but the record does not show he was able to provide the "information that would have been available from the missing photographs." Mr. Gray testified he worked for the Rossford Police Department on September 5, 1982, and "I was called by Officer Bob Bratton to come over and take a look at the scene and give my opinion of what I could see." Mr. Gray concluded that the "tire marks on the roadway" pointed out by Mr. Bratton were acceleration marks, not skid marks. Mr. Gray does not have any photos, measurements, calculations, weather conditions, roadway description, diagrams or maps from his investigation or his report itself to support his opinion. Mr. Gray relied on his memory and speculation. He could not recall the weather conditions. He assumed the tire marks were somehow related to the incident involving Ms. Rosendale because Mr.

32.

Bratton said they were. He never saw Ms. Rosendale's body, and never saw where her body was found in relation to the tire marks, but, again, relied on what Mr. Bratton told him. He also never saw appellant's vehicle, measured the tires, or inspected the passenger door latch.

{¶ 73} The record contains conflicting speculation regarding whether Ms. Rosedale's body was found somewhere on Tracey Road, on gravel adjacent to the roadway, or on grass near the roadway. Mr. Bratton told Mr. Gray the body was in the road or a little off to the side, but Mr. Billings recalled Ms. Rosendale's body was not in the road but in the berm between the road and grass with her feet pointing toward a sidewalk.

{¶ 74} When the trial court issued its June 24, 2015 judgment entry, the judge referred to photographs as "preferable," but we find the missing photos taken of the scene and of Ms. Rosendale's body at the scene are more than "preferable" because Mr. Gray's testimony was unable to replicate the "content and import" of those photos. The record of the second trial does not contain any descriptions of what each of the missing photos showed. The only testimony was that the photos once existed, not what they contained, and Mr. Kinder stated, "for me to say anything other than that would be speculative."

{¶ 75} We find the missing physical evidence cited by the trial court's June 24, 2015 decision was relevant to appellant's defense at the second trial and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms.

33.

Rosendale to death and bolster appellant's defense she accidentally fell out of his moving car.

### iii.  Faulty Passenger Car Door Latch

{¶ 76} Appellant also points to his missing car with the faulty passenger door latch as meeting his burden to prove actual prejudice.  Ms. Rosendale's best friend, Roxanne Pelow, testified appellant's passenger car door was faulty even before September 5, 1982.  Appellant argues Ms. Pelow's testimony about the faulty door was exculpatory as being consistent with appellant's statements to law enforcement.  Appellant argues his defense would have been bolstered with the evidence of the car's actual faulty passenger door latch, a fall from which would be consistent with Ms. Rosendale's injuries found exclusively on her right side by Dr. Fazekas.

{¶ 77} The record shows that on September 5, 1982, Ms. Rosendale and Ms. Pelow rode with appellant in his car after the Southside Roxy, a nightclub located in south Toledo where appellant worked as a bouncer, closed for the night because they had arrived by bus.  Both women knew appellant from their prior visits to the nightclub, and appellant previously drove them to their different homes.  Ms. Pelow lived in Lambertville, MI and Ms. Rosendale lived in Northwood, OH.  Ms. Pelow told police Ms. Rosendale drank heavily that night, consisting of at least 13 beers and consuming Valium.  Ms. Pelow testified Ms. Rosendale was "[v]ery groggy, very intoxicated" when they left the nightclub with appellant.

34.

{¶ 78} According to Ms. Pelow, "We had to get in through the driver's side because the passenger door, it was known, it was faulty." Ms. Pelow testified both she and Ms. Rosendale knew the passenger door was faulty before that night. They agreed the first stop would be Ms. Pelow's house in Lambertville. Ms. Pelow said she took precautions to not lean on the passenger door "[b]ecause I didn't want to fall out." Upon arrival, Ms. Rosendale exited the vehicle with Ms. Pelow's help, used her bathroom, and then Ms. Pelow helped the lethargic Ms. Rosendale return to appellant's car. Ms. Pelow helped Ms. Rosendale enter the front seat of the car through the passenger door, and saw Ms. Rosendale position her body to sit with her head resting on the car seat and facing toward appellant. Ms. Pelow then made sure the passenger door closed securely from the outside. Then appellant drove off.

{¶ 79} Mr. Bratton testified he was made aware starting on September 5, 1982, from appellant, Ms. Pelow and Ms. Rosendale's family members that the passenger door latch was faulty. He thought he had looked at appellant's car once on September 5, 1982, and "did not see any malfunction * * * in the door," but he could not recall what examination he gave the passenger door, and there was no report of an examination. Moreover, Mr. Zahradnik testified that Mr. Bratton admitted he did not check the car door, but Mr. Gray may have instead. Mr. Zahradnik never spoke with Mr. Gray to confirm. Mr. Gray, in turn, testified he never inspected appellant's passenger car door. Mr. Helm testified by the time of the indictment appellant's car could not be located.

35.

{¶ 80} Christopher Kinn, an accident reconstructionist for the Ohio State Highway Patrol, testified that in 2015 Mr. Kinder asked him to review the evidence and the second autopsy injuries to make a "does it make sense" assessment regarding appellant's faulty passenger door latch claim. Mr. Kinn was unable to reconstruct the scene from September 5, 1982, because too many changes had occurred over time. Nevertheless, Mr. Kinn authored a report concluding, "Based on the information provided to me, I do not believe it likely that Ms. Rosendale fell out of a moving vehicle from the incident that occurred on September 5, 1982."

{¶ 81} Frederick Greive, a traffic crash reconstructionist, testified he authored a report in 2015 in which he disagreed with Mr. Kinn's opinion, but did agree that the crash scene could not be reconstructed. Mr. Greive opined that it is not difficult to open a car door at 25 miles an hour, especially if there is something wrong with the latch. "Say a car is hit someplace and the door doesn't want to shut tight and you have to force it shut and the latch doesn't latch right, the door could pop open and fly open." As a result, he testified Ms. Rosendale's injuries were consistent with falling from the passenger side, "If, again, a person falls out of a car, if it's the right side and they fall out right side, back first, the right side of the head will probably be the first thing that hits the ground."

{¶ 82} Contrary to the trial court's June 24, 2015 decision, the "contents and import" of the missing car and any visual or written evaluation of the operation of the passenger door latch on September 5, 1982, cannot be "gleaned from the remaining witnesses and evidence." The record of the second trial does not contain the police report

identifying the missing car or any recording or visual aid of the tests performed of the operation of the passenger door latch. Mr. Bratton's personal notes are missing, along with all photos, diagrams, recordings and written descriptions that were contained in reports prepared and kept by the law enforcement investigators, which are, in turn, also missing. Although Mr. Bratton testified he found nothing wrong with the passenger door on September 5, 1982, the record shows there is evidence questioning Mr. Bratton's memory because Mr. Bratton may never have actually observed how appellant's passenger car door latch operated. We find the unavailability of appellant's car and lack of any record testing the operation of the passenger door latch are relevant to appellant's defense and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms. Rosendale to death and bolster appellant's defense she accidentally fell out of the passenger side of his moving car.

### iv. The Victim's Clothing

{¶ 83} Appellant also points to the victim's missing clothing as meeting his burden to prove actual prejudice. Appellee's theory that appellant severely beat Ms. Rosendale in the head raised issues of blood being present at the scene and on the victim's clothing. Appellant's defense that Ms. Rosendale accidentally fell out of his moving car raised issues of clothing that is torn or with grass stains from falling onto the roadway or gravel or grass. The record of the second trial does not contain any reports identifying the victim's clothing or any written description or recording or visual aid of

37.

her clothing and their condition at the scene or at the hospital. Ms. Rosendale was not buried in the clothing she wore on September 5, 1982.

{¶ 84} Mr. Billings testified from memory, "I noticed her clothing. It was not disheveled, and * * * did not have a lot of grass stains or anything of that nature on it. She – they were in pretty good condition." He did not notice "any blood anywhere on her clothing."

{¶ 85} Mr. Kinn testified he would expect that if Ms. Rosendale fell out of a moving car, her clothing would reflect that impact. "I would expect that, you know, the abrasions or, you know, * * * and/or the clothing ripped from coming into contact, from getting where the car was driving down the road to where she came to a final rest." Mr. Greive agreed.

{¶ 86} Dr. Diaz testified "it would be beneficial to have the description of the clothing and the fabric" because it is important with respect to road rash. He opined that some clothing protects the outer skin layer better in addition to speed and road conditions.

{¶ 87} Contrary to the trial court's June 24, 2015 decision, the "contents and import" of the victim's missing clothing worn on September 5, 1982, cannot be "gleaned from the remaining witnesses and evidence." The record of the second trial does not contain the police report or hospital records identifying the victim's missing clothing or any recording or visual aid of the color, style, thickness, and condition of the missing clothing when the victim was found either on or near Tracey Road. Although Mr.

38.

Billings testified he did not recall any torn or ripped clothing, suggesting Ms. Rosendale did not tumble out of a moving car, he also did not recall any blood on her clothing, which would be expected from a severe head beating. Mr. Billings did not testify as to the color of the victim's clothing. The 1982 BCI lab test record merely indicates white and orange fibers were tested, but there is nothing in the record to connect those fibers to Mr. Billing's memory of the victim's clothing. Mr. Billings' personal notes are missing, along with all photos, diagrams, and written descriptions that were contained in reports prepared and kept by the police, fire department, and St. Charles hospital, which are, in turn, also missing. We find the unavailability at the second trial of the victim's clothing worn on September 5, 1982, is relevant to appellant's defense and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms. Rosendale to death and bolster appellant's defense she accidentally fell out of his moving car.

### v. Faded Memories

{¶ 88} Appellant also points to various witnesses repeatedly indicating that accurate recollection of, and recreation of, details from September 5, 1982, after over 30 years, would be aided by the missing physical evidence, and meets his burden to prove actual prejudice. The June 24, 2015 trial court judgment entry states, "There is some indication that several of the witnesses who were interviewed in 1982 are having difficulty remembering the events surrounding Ms. Rosendale's death." The record shows the following witnesses lamented in some manner the impact of the missing

39.

physical evidence on their memories of the details: Mr. Helm, Mr. Billings, Mr. Bratton, Mr. Gray, Mr. Cowell, Ms. Pelow, and appellant. The record also shows the following witnesses lamented in some manner the impact of the missing physical evidence on their opinions of exactly what occurred to Ms. Rosendale on September 5, 1982: Dr. Scala-Barnett, Mrs. Saul, Dr. Symes, Dr. Spitz, Dr. Diaz, Mr. Zahradnik, Mr. Kinn, Mr. Kinder, and Mr. Greive.

{¶ 89} Contrary to the trial court's June 24, 2015 decision, the "contents and import" of the missing physical evidence and unavailable witnesses, was not "gleaned from the remaining witnesses and evidence" at the second trial due, in part, to their faded memories. The record of the second trial contains abundant speculation by the witnesses in the absence of any photos, diagrams, transcripts and detailed written descriptions that were contained in the contemporaneous reports prepared and kept by the police, fire department, and St. Charles hospital decades ago, which are, in turn, also missing. We find the witnesses' varying levels of faded memories by the time of the second trial are relevant to appellant's defense and could reasonably be expected to minimize the impact of appellee's evidence that appellant beat Ms. Rosendale to death and bolster appellant's defense she accidentally fell out of his moving car.

{¶ 90} Appellant's first assignment of error is well-taken.

{¶ 91} Having found appellant met his burden of showing actual prejudice, the burden shifts to appellee to present evidence of a justifiable reason for the delay.

40.

## II. Unjustified Delay

{¶ 92} Appellant's second assignment of error alleges the trial court abused its discretion in allowing a former Ohio Attorney General and Wood County Prosecutor, Betty Montgomery, to testify at the second trial to provide irrelevant and prejudicial evidence because she did not make the decision in 2015 to commence prosecuting appellant. Stated another way, this error alleges Ms. Montgomery did not provide appellee with a justifiable reason for the 33-year preindictment delay. Therefore, we will review together the second part of preindictment delay analysis with the abuse of discretion analysis.

### A. Legal Standard

{¶ 93} Unjustified delay was described by the Ohio Supreme Court in *Luck*:

This court will not assume the role of the prosecutor to determine when there is sufficient evidence to seek an indictment in every case; and we agree with the rationale of [Lovasco] that it would be unwise to adopt a rule requiring the commencement of prosecution whenever there is "sufficient evidence to prove guilt beyond a reasonable doubt." We believe, however, that a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant or when the state, through negligence of error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the

same evidence that was available to it at the time that its active investigation was ceased. The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable.

*Luck*, 15 Ohio St.3d 150, 158, 472 N.E.2d 1097 (1984), quoting *United States v. Lovasco*, 431 U.S. 783, 792, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); citing also *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)

{¶ 94} We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 122. Abuse of discretion connotes the record shows the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Relevant evidence is generally admissible, while irrelevant evidence is inadmissible. Evid.R. 402. Moreover, even relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403.

### B. Analysis

{¶ 95} Before Ms. Montgomery, the elected Wood County Prosecutor from 1981 through 1989, testified, the record shows Mr. Bratton and Mr. Helm had already testified Ms. Montgomery did not pursue prosecuting appellant for Ms. Rosendale's death from

1982 until 1989 because of Dr. Fazekas's "undetermined" opinion. Both witnesses affirmed the decision to prosecute rested solely with the prosecutor, whether it was Ms. Montgomery or her successors. Moreover, the record shows the investigation over the decades primarily produced the same information that was gathered in 1982, with the exception of a new coroner's "homicide" opinion.

### 1. Investigation From 1982 to Indictment

{¶ 96} The trial court previously stated in its June 24, 2015 judgment entry there was no investigation by law enforcement from 1985 to 2012, and the information from Dr. Scala-Barnett's second autopsy determining "homicide" was the only new evidence.

{¶ 97} Mr. Bratton testified, "It was apparent that * * * it was going to possibly be a death investigation, so we started looking at it from that perspective." Despite the focus on a homicide and meeting with Ms. Montgomery "[a]t least ten times" to meet to discuss this case, Ms. Montgomery did not proceed to an indictment of appellant "because of the coroner's ruling." The decision to not prosecute was solely hers from 1982 to 1989, but not after.

{¶ 98} Mr. Helm, the Wood County Prosecutor investigator under Ms. Montgomery's term as Wood County Prosecutor and under her successors Alan Mayberry, Raymond Fischer and Paul Dobson until 2014, testified no prosecutor would proceed to indict appellant due to Dr. Fazekas's "undetermined" autopsy ruling. While Dr. Fazekas's ruling remained unchallenged, the statute of limitations lapsed "on everything but murder or aggravated murder." Mr. Helm conducted some investigation

43.

over the years, but realized that not even DNA was likely to help the prosecution of a cold case.

> Q: [H]ow do you determine which [cold case homicides] are viable to reopen?
>
> A: [T]he chief criteria is does * * * the evidence lend itself to new scientific examinations such as DNA and other scientific-type leads, what is the status of the evidence, is it still accessible, is it still testable. * * * It used to be that evidence was sealed in plastic bags, which was good because it protected the evidence from contamination from the outside, but with the advent of DNA, what was found was that it also seals moisture inside, so a lot of evidence will deteriorate. Contamination that was in the bag would make the evidence unsuitable for DNA testing.

{¶ 99} The record shows that appellee waited 33 years to indict appellant because the prosecution finally obtained a "homicide" opinion by Dr. Scala-Barnett to challenge Dr. Fazekas's "undetermined" opinion. Dr. Scala-Barnett was only able to conclude a "homicide" after Ms. Rosendale's body was exhumed on October 9, 2013. There is nothing in the record of the second trial to indicate that exhuming Ms. Rosendale's body was unavailable to appellee from 1982 to 2013. Meanwhile, an extraordinary amount of physical evidence critical to this case was lost or destroyed by appellee, including photographs, medical records, and the victim's clothing. We find appellee effectively ceased active investigation of this case for at least 30 years. We find the length of the

44.

33-year delay is a key factor because appellee presented at the second trial witness testimonies based largely on memory of the events in 1982. These witnesses were all available at the time its active investigation ceased. These witnesses, according to the trial court, were to provide the "content and import" of the physical evidence and witnesses missing by 2015. As previously determined by this court for appellant's showing of actual prejudice, the witness testimonies did not fulfill the trial court's expectation. We also find the lengthy delay gave the prosecution a tactical advantage over the defendant because the only new material evidence for appellee, Dr. Scala-Barnett's opinion, could not be rebutted by Dr. Fazekas because he died during the 33-year delay.

## 2. Ms. Montgomery's Testimony.

{¶ 100} Appellant argues the testimony by Ms. Montgomery was irrelevant and unduly prejudicial. "In other words, Montgomery thought Adkins was guilty, and the only reason she did not prosecute him was to ensure that the State had enough evidence to obtain a conviction." Because she testified she unequivocally wanted to prosecute appellant, "the only logical inference from her testimony was that she believed Adkins was guilty" because she did not yet have enough evidence to prove murder beyond a reasonable doubt. "In other words, Montgomery's testimony served no purpose beyond providing her opinion that Adkins was guilty." Appellant argues, "In assessing prejudice it should be noted that at Adkins's first trial Montgomery did not testify, and the jury did not render a guilty verdict." Appellant further argues, "Any juror who trusted

Montgomery would have believed that Montgomery's confidence in Adkins's guilt was probative that he was actually guilty." Consequently, appellant argues the trial court abused its discretion when it admitted her testimony over appellant's objections.

{¶ 101} In response appellee argues the trial court did not abuse its discretion because the "gist of her testimony was that the Prosecutor's Office was aware of Adkins in 1982 as a suspect in Dana's death, but there was not enough evidence to prove beyond a reasonable doubt that Russell Adkins murdered her. So Adkins was not prosecuted at that time." Appellee argues that Ms. Montgomery's testimony was necessary to rebut the testimony by Mr. Helm and Mr. Bratton who appellant questioned on cross-examination as to Wood County Prosecutor's Office procedures in 1982. Appellee argues, "Ms. Montgomery's testimony was short and not tremendously prejudicial to Adkins." Appellee further argues the "vast majority of Ms. Montgomery's testimony as to protocols and how, as well as why, police departments destroy evidence actually helped Adkins's theory of the case." Appellee urges Ms. Montgomery "was testifying as a witness not acting as the trial prosecutor" and she "did not speak as to Adkins's guilt, [but] merely why a prosecution was not pursued in 1982."

{¶ 102} According to the transcript of the second trial, prior to Ms. Montgomery's testimony, appellant made an oral motion to exclude her testimony pursuant to Evid.R. 401 and 403:

Judge, it's our understanding that the State intends to call Betty Montgomery this morning as a witness. We have been given I would say a

46.

short report simply saying that a detective spoke to her, she remembers the case, I believe, and she'd be willing to come in and testify. So we don't know exactly what she may say, but we anticipate her testimony will be an explanation to the jurors why charges were not brought back in 1982. Based on that anticipation, we would object to Ms. Montgomery testifying because whether the charges were brought is irrelevant to the issues in this case, the issues being whether Mr. Adkins did what the State has now accused him of * * * there's [also] a risk that it confuse the issue and the risk of undue prejudice; that is to say, the prejudicial value of this evidence substantially outweighs any probative value about the issues that the jury will have to decide.

{¶ 103} In response appellee argued Ms. Montgomery's testimony was relevant because it "just goes towards explaining the passage of time" which appellant explored on cross-examination with other witnesses. We find Ms. Montgomery's testimony only covered the first seven years of the 33-year preindictment delay at issue in this appeal.

{¶ 104} The trial judge then denied appellant's motion, and just before Ms. Montgomery proceeded to testify, the trial judge gave the following instruction to the jury:

Just as a matter of note, Jurors, Ms. Montgomery is an attorney. Therefore, she's an officer of the court. Therefore, she is obligated to tell

47.

the truth, the whole truth, and nothing but the truth and no further swearing in is needed.

{¶ 105} Ms. Montgomery then testified that as the elected Wood County Prosecutor for two terms she was responsible for making the "decision as to who and how and what to charge individuals." She then reviewed her many accomplishments as an elected official in Ohio, including her terms as an Ohio State Senator, Ohio Attorney General, and Ohio State Auditor. She recalled the death of Ms. Rosendale on September 5, 1982, and Dr. Fazekas's autopsy classifying Ms. Rosendale's cause of death as "undetermined." Because of that classification, Ms. Montgomery did not seek an indictment, despite all of the other physical evidence available at that time. Nor did Ms. Montgomery expect Dr. Fazekas to change his mind as a result of her ongoing investigation.

> Q: And as a result of the investigation and the coroner's report, did you make a decision as to whether or not to go forward with charges at that time?
>
> A: I did, and let me explain that. Generally speaking, I * * * was very law and order and used to be a fairly tough prosecutor, and I * * * wanted to prosecute this case. I knew Russ Atkins [sic]. And I believed he knew – I believed he had * * * I believed that we didn't have sufficient evidence because the coroner's report was undetermined. It's hard with a burden of proof, particularly in a murder case, to get past a coroner's

48.

verdict that is indeterminant [sic] when you're trying to prosecute with such a case. And as much as I wanted to prosecute it, I didn't, because you have generally one bite of the apple in these cases, and if you try a case with insufficient evidence and you get a not guilty, you can't go back. And so it's quite likely in these kind of cases that you can over time develop witnesses or evidence and we can go back with a stronger case, and that's what I decided to do.

* * *

Q: And I think you said that inasmuch as [Dr. Fazekas's decision] was undetermined, * * * if you find more witnesses or if you find additional evidence, then that determination, undetermined, could be changed?

A: Well, I didn't say that, but it would change my look at whether we could prosecute the case, reach that burden of beyond a reasonable doubt. But also at that point if it was sufficient evidence to try the case, it would certainly be sufficient evidence to go back and get a verdict changed * * * if the coroner were willing to do it. Again, * * * I'm not the boss of the coroner.

{¶ 106} It is well established "the prosecution must avoid insinuations and assertions which are calculated to mislead the jury." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984), citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79

49.

L.Ed. 1314 (1935). Moreover, it is also well-established that prosecuting attorneys may not express their personal beliefs or opinions as to the credibility of a witness, as to the guilt of the accused, or to matters which will not be supported by admissible evidence because the attorney implies knowing something outside the evidence. *Id.*, citing *State v. Thayer*, 124 Ohio St. 1, 6, 176 N.E. 656 (1931).

{¶ 107} The fact that Ms. Montgomery was not the Wood County Prosecutor in 2015 when appellant was finally indicted does not mitigate the impact of her statements as the former Wood County Prosecutor and Ohio Attorney General, among other high profile elected positions in state government. Ms. Montgomery was not, as appellee suggests, merely "a citizen who happens to be an attorney in the active practice of law in the state of Ohio." As the U.S. Supreme Court recognized in *Berger*, Ms. Montgomery's opinions formed as a result of holding these elected positions must both reflect her "duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *See Berger* at 88. Moreover, the U.S. Supreme Court further held, "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* The Ohio Supreme Court recognizes those comments apply with equal force to Ohio prosecuting attorneys. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). While the Ohio

50.

Supreme Court routinely reverses convictions where such opinions are expressed in the record, it will not find prejudicial error "where the reference to matters outside the record is short, oblique, and justified as a reply to defense arguments and elicits no contemporaneous objection." *Id.*

{¶ 108} We do not find these mitigating factors present with respect to Ms. Montgomery's testimony. Her direct examination may have been short relative to other appellee witnesses, but it was not oblique because she was the sole decision-maker to not prosecute appellant during her term as Wood County Prosecutor. Nor was it justified as a reply to defense arguments because other witnesses had already testified neither Ms. Montgomery nor any of her successors decided to indict while Dr. Fazekas's "undetermined" classification remained unchallenged. Moreover, her testimony did elicit contemporaneous objection, which the trial court overruled. Further, appellee acknowledges her testimony was prejudicial, just "not tremendously prejudicial."

{¶ 109} We also recognize the potential prejudice arising from the trial judge's implicit endorsement of Ms. Montgomery's truthfulness by not submitting her testimony to the same oath as all other witnesses at the second trial. Evid.R. 603; R.C. 2317.30. However, we find appellant waived this argument as there was no objection in the record specifically to the lack of her oath. *Stores Realty Co. v. Cleveland, Bd. of Bldg. Stds. & Bldg. Appeals*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975).

{¶ 110} Nevertheless, we are left to review for plain error in the context of abuse of discretion review for the trial court admitting Ms. Montgomery's testimony. Crim.R.

51.

52(B); s*ee In re J.B.*, 6th Dist. Sandusky Nos. S-14-005, S-14-006, S-14-007, S-14-008, S-14-009, S-14-012, S-14-013, S-14-014, 2015-Ohio-460, ¶ 94, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122, 679 N.E.2d 1099 (1997).  We find the trial court's error of admitting Ms. Montgomery's unsworn testimony is obvious in the record, palpable and so fundamental that the substantial prejudice to appellant should have been apparent to the trial court without objection such that "the appellate court acts in the public interest because the error affects 'the fairness, integrity or public reputation of judicial proceedings.'" *State v. Burks*, 6th Dist. Lucas Nos. L-05-1346, L-05-1347, 2007-Ohio-3562, ¶ 15, citing *State v. Craft*, 52 Ohio App.2d 1, 7, 367 N.E.2d 1221 (1st Dist.1977), quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936).

{¶ 111} It is undisputed Ms. Montgomery's testimony provided no new facts into evidence regarding any element of the crime allegedly committed by appellant, nor did her testimony introduce new material facts for the final 26 years of appellee's 33-year preindictment delay justification burden.  Rather, Ms. Montgomery's testimony contained her opinion that appellant murdered the victim in 1982, "as much as I wanted to prosecute it, I didn't," which we can reasonably conclude confused the jury with the presumption of her truthfulness as the former two-term Wood County Prosecutor and two-term Ohio Attorney General.  The result is plain error.  We find Ms. Montgomery's testimony was irrelevant and inadmissible.  Even if her testimony was relevant, we find it was inadmissible because its minimal probative value was substantially outweighed by

52.

the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The trial court's decision to admit her unsworn testimony was unreasonable, arbitrary or unconscionable and created a material prejudice such that the trial court abused its discretion.

### 3. New Science.

{¶ 112} Appellee also advances as a delay justification the advent of "new science." In response, appellant argues appellee "identifies no new evidence or technology that was not available to it in 1982." Ultimately, appellant argues, the 33-year preindictment delay "was caused not because of unavailable technology, but because the State simply stopped investigating * * *. Waiting 30 years and then finding an expert with a different opinion does not suffice to justify the delay."

### a. Forensic Anthropology

{¶ 113} The first "new science" justification asserted by appellee is a forensic pathologist's use of a forensic anthropologist to clean Ms. Rosendale's skull and see all the skull fractures, even though an autopsy does not require it. According to Dr. Scala-Barnett:

> Since 1982 when that autopsy was performed, science has evolved.
> Science has progressed. And Dr. Fazekas did not have any of the bone
> cleaned. He never reflected the scalp down. He never took the dura off.
> There was [sic] a lot of things – he never took the neck organs out to see

53.

the hyoid. * * * And he would have seen the fracture pattern better had he had an anthropologist help him.

* * *

Q: As you mentioned, the use of an anthropologist as far as cleaning something that you may want to look at, that is something that you can request to occur, correct?

A: Yes, I have to request it.

Q: Okay. But it does not in and of itself, that request – you can accomplish an autopsy without making that request?

A: Oh, you can accomplish an autopsy. There's no question about it. * * * But you won't see everything you need to see. * * * If there's a pattern on the bone.

{¶ 114} The record already shows the sole reason appellee commenced prosecuting appellant in 2015 was Dr. Scala-Barnett's "homicide" opinion. The record also shows the main difference in autopsy methods between Dr. Fazekas's 1982 autopsy and Dr. Scala-Barnett's 2013 autopsy was the forensic anthropologist consultation of Mrs. Saul requested by Dr. Scala-Barnett. Mrs. Saul and her husband had provided consultation services to the Lucas County Coroner's office since 1985 and, starting in 1990, moved their lab to the coroner's office. The record shows Mrs. Saul has been doing the work of a forensic anthropologist under her husband's supervision since 1964.

54.

There is nothing in the record to indicate whether Dr. Fazekas considered using a forensic anthropologist.

{¶ 115} Dr. Spitz strongly disagreed that a forensic anthropologist should be consulted by a forensic pathologist to determine the cause and manner of death. Since 1953 when he began working as a forensic pathologist, "I have never in this span of time, neither did I need nor did I ever employ * * * an anthropologist to tell me what to put on the death certificate or to tell me, oh, this is this and this is that and that's the other." The simple reason is because forensic pathologists have to form and defend their opinions.

What I need, I can do. And what I don't need, I call in another forensic pathologist to help me if I need it. * * * I'm sorry to tell you, [forensic anthropologists] don't assist me, and if they assist somebody else, that's their business. * * * I do not see the need * * * in my profession * * * to need an anthropologist to tell me what somebody died of. Anthropologists are very significant to determine who is who. * * * There's a danger in employing an anthropologist, because I am the one responsible and not the anthropologist, and I may be hung on his or her mistakes. So I don't go [sic] that risk. I want to be sure that what I determine I can vouch for.

{¶ 116} As to what Ms. Saul did to Ms. Rosendale's skull, Dr. Spitz testified why he does his own bone cleaning rather than rely on an anthropologist:

55.

But in this case I need to point out to you that there is significant evidence of too much cleaning. This bone – skull was boiled too much, too long causing disintegration, gaping of fractures, and maybe even producing fractures. * * * I would disagree that there was no damage, and I could show it to you if you want me to.

{¶ 117} Dr. Symes confirmed that a forensic anthropologist's role is not to replace the forensic pathologist, but "to contribute to the analysis conducted by the forensic pathologist." He testified the field of forensic anthropology, which dates to the '30s and '40s, was "hot" in the '80s and "then in the '90s it's running at full throttle." He testified that a county prosecutor in 1982 could have found a forensic anthropologist to answer questions about fractures in a skull. "Yes, although * * * there weren't a lot of * * * forensic anthropologists floating around at that time * * * if there's universities around, there's a physical anthropologist somewhere."

{¶ 118} We find that the field of forensic anthropology is not a new science and did not justify the 33-year delay for appellee commencing prosecution of appellant for murder.

### b. DNA Testing

{¶ 119} The second "new science" justification asserted by appellee is DNA testing of Ms. Rosendale's fingernail clippings taken by Dr. Scala-Barnett during the second autopsy, despite Dr. Fazekas's original autopsy not identifying any defensive wounds on the victim.

56.

{¶ 120} Mr. Kinder testified he obtained a buccal swab of appellant's DNA pursuant to a May 8, 2015 search warrant on the basis that appellant "had been the last person to see Ms. Rosendale" thinking that "it is probable that when attacked by Mr. Adkins, Dana Rosendale may have gotten Russell N. Adkins' DNA under her fingernails while trying to protect and/or defend herself." Mr. Kinder acknowledged the DNA analysis was not helpful because "the test result was that the male chromosome under her nail did not belong to Russ Adkins."

{¶ 121} Steven Weichman, a BCI forensic scientist, testified, "Back in 1982 there was really no DNA analysis specific to forensics." Mr. Weichman then testified DNA testing in Ohio has been available since 1996, when he began with BCI. In fact, DNA testing "came into the forensic community" in the mid to late 1980s and then "it really took off in the mid to late '90s." In 2015, Mr. Weichman conducted the DNA analysis of Ms. Rosendale's fingernail clippings sample with appellant's buccal swab, and concluded, "Mr. Adkins in making that comparison was excluded as being a contributor to that sample."

{¶ 122} We find that DNA is not a new science and did not justify the 33-year delay for appellee commencing prosecution of appellant for murder.

{¶ 123} In sum, appellee has not established a justifiable reason for delaying the prosecution of this case. Failure to do so resulted in actual prejudice to appellant.

{¶ 124} Appellant's second assignment of error is well-taken.

57.

### III. Conclusion

{¶ 125} We find appellant did not receive a fair trial due to actual prejudice from preindictment delay without justification.

{¶ 126} On consideration whereof, we find that substantial justice has not been done in this matter. The judgment of the Wood County Court of Common Pleas is reversed and appellant's judgment of conviction is vacated. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed and
conviction vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

JUDGE

Thomas J. Osowik, J.

_____

James D. Jensen, J. JUDGE
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.